UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

            vs.                              DECISION AND ORDER
                                         05-CR-6050 CJS

KEITH BENNETT,

                      Defendant.
_____

      This matter came before the Court on the defendant's motion to suppress tangible evidence. At the hearing held upon the defendant's application, four witnesses testified: New York State Parole Officers John Jenkins and Gary Cowick; Senior New York State Parole Officer William Fortune; and Rochester Police Officer Robert O'Shaughnessy. Based upon the Court's findings of fact and analysis, as set forth below, the defendant's application to suppress is denied.

**FINDINGS OF FACT**

      Gary Cowick ("Cowick") has been employed by the New York State Division of Parole as a parole officer for one year. He has the responsibility of supervising parolees until they are released from parole. As of January 14, 2005, Cowick was supervising the defendant, Keith Bennett ("Bennett"), who was on parole for Criminal Sale of a Controlled Substance. Cowick had been supervising Bennett since mid September of 2004. On August 1, 2003, in connection with his parole, Bennett had signed a document captioned "Certificate of Release to Parole Supervision," which was received into evidence as Exhibit #2. This document, under "Conditions of Release," condition #4, in pertinent part, states: "I will permit my parole officer to visit me at my residence and or place of employment and

I will permit the search and inspection of my person, residence and property." Bennett had previously been on parole for another offense, during which time he was violated for absconding from supervision.

John Jenkins ("Jenkins") has been employed by the New York State Division of Parole as a parole officer since 1984. His current position is absconder search officer for the Division of Parole in the Western Region. His primary duty is to locate parole violators with outstanding parole warrant, and his secondary duty is to liaison with law enforcement and to act as on-call officer after duty hours. As on-call officer, Jenkins is available after hours by cell phone to local law enforcement officers who have issues concerning parolees.

In February of 2004, Bennett had his parole violated for possession of marijuana, driving without a driver's license and being outside of Monroe County. Then on December 27, 2004, Cowick was contacted by fellow parole officer Mike Valenti ("Valenti") concerning Bennett. Valenti showed Cowick a field interview form ("F.I.F.") from the Rochester Police Department ("R.P.D.") which reported that Bennett had been in a vehicle that fled from the police and that vehicle fit the description of a car involved in a shooting incident. The F.I.F. was introduced into evidence as Exhibit #5. On January 4, 2005, Cowick discussed this information about Bennett with his supervisor, Senior Parole Officer William Fortune ("Fortune"). Fortune directed Cowick to conduct a parole search of Bennett's residence at 9 Woodrow Street to determine if Bennett was in possession of a gun. Pursuant to Fortune's direction, Cowick assembled a parole search team, which included both Jenkins and Fortune and conducted a search of 9 Woodrow Street on January 12, 2005. This search did not result in the recovery of a gun, but did result in the discovery of $7,000 in

U.S. currency, some of which was singed, wrapped in tin foil in a shoe box underneath a bunch of miscellaneous items at the bottom of another box in a closet in Bennett's bedroom. The amount of money made Cowick suspicious, since, at the time the money was discovered, Bennett was only working part time, assisting a roofer. That same day the Division of Parole alerted law enforcement agencies, via teletype, to the discovery of the $7,000. Parole was subsequently contacted, either later on January 12, 2005 or the next day, January 13, 2005, by law enforcement officers from Ontario County about the possibility that the money might have been stolen from a safe from a mall, because it was believed that a torch was used to gain entry into the safe, which would have resulted in the singeing of the money inside. Additionally, during the course of the search of 9 Woodrow Street on January 12, 2005, Fortune noticed passport-type photos of the defendant.

     Late in the afternoon of January 14, 2005, Cowick was contacted by an individual who identified himself as Raymond Allen ("Allen") and who indicated that he was a friend of Keith Bennett. Allen said that he had information that Bennett was attempting to flee the country to Honduras and that Bennett was trying to get a fake passport from a guy named Pudge. Cowick knew from his review of Bennett's file that Bennett was in fact from Honduras. Cowick told Allen that if he obtained any more information, he should call Jenkins, and, in that regard, gave Allen Jenkins' cell phone number. Since Cowick's own supervisor, Fortune, was not available at the time, he contacted Senior Parole Officer Philip Overfield ("Overfield"), who was Jenkins' supervisor. Pursuant to Overfield's instructions, he alerted security personnel at the Monroe County Airport to the possibility that Bennett might be attempting to flee the country. Cowick also called Jenkins, who was on an assignment in Niagara Falls, and informed him of his conversation with Allen. Specifically,

Cowick advised Jenkins that he might be receiving a phone call from an individual named Ray Allen, concerning parolee Bennett. Further Cowick indicated that he gave Allen Jenkins' cell phone number. Cowick also explained to Jenkins that Allen had information that Bennet was possibly planning to leave the country, and that, while Bennett did not have a passport, he was attempting to obtain one. Cowick also told Jenkins that, if Bennett was able to obtain a passport, Allen would call Jenkins.

Subsequently, on January 14, 2005, after speaking with Cowick, Jenkins did receive a phone call from Allen. Allen told Jenkins that Bennett did not have a passport yet, but that he would keep Jenkins updated on the situation. Allen also told Jenkins that he had previously seen Bennett in possession of a gun and that he believed that Bennett was still in possession of it. Jenkins asked Allen to get more details on the gun and its whereabouts, and call him back.

The next day, January 15, 2005, Jenkins received another telephone call from Allen at about 5:30 a.m. Jenkins spoke to Allen for about fifteen minutes. Allen indicated that he had been partying with Bennett the previous night and he had observed a handgun in the possession of either Bennett or Bennett's roommate, but believed that the weapon was now with Bennett. Allen also stated to Jenkins that both Bennett and his roommate were asleep and would be there, and that, if they left, he would know. Allen told Jenkins that he needed a few hours for the situation to calm down before Jenkins came over. Additionally, during the conversation, Jenkins questioned Allen about the passport, but because Allen's information as to Bennett obtaining a passport was sketchy, Jenkins concluded that Allen's information, as to the passport, was very questionable. However, as to the gun, although Jenkins had no way of knowing for sure at the time he was speaking with Allen, if Allen's

information concerning the gun was reliable, Jenkins believed it was reliable. This was so, even though, based upon the fact that Allen's speech was slurred and he seemed nervous and agitated, Jenkins concluded that he was extremely intoxicated. In any event, Jenkins decided to give Allen the leeway he requested.

On that same day, January 15, 2005, at 7:17 a.m, Rochester Police Officer Robert O'Shaughnessy ("O'Shaughnessy") was dispatched to 9 Woodrow Street because of a possible possession of a gun at the residence by a parolee named Keith Bennett. After receiving the dispatch, O'Shaughnessy met up with fellow police officer, Marcus Rodriguez ("Rodriguez"), and proceeded to the location. Upon arrival, the two officers went to the front door and O'Shaughnessy knocked. Bennett answered the front door, and O'Shaughnessy asked if he and Rodriguez could enter the house because it was cold outside. Bennett let the officers inside, at which point O'Shaughnessy informed him that someone called 911 stating he had a gun in the house, and asked Bennett if they could search the house. Bennett said no, and indicated that parole had been there a couple days prior and searched. At approximately 7:36 a.m., upon Bennett's refusal, O'Shaughnessy called the dispatcher and asked that parole be contacted for assistance. Subsequently, Cowick and then Jenkins arrived at 9 Woodrow Street.

At about 7:30 a.m. on January 15, 2005, Jenkins took action on the information he had received concerning Bennett. Specifically, he proceeded to Bennett's residence at 9 Woodrow Street in the city of Rochester. While on-route, Jenkins used his cell phone to call Cowick. Jenkins brought Cowick up to date and asked Cowick to assist him. Jenkins then made a phone call to his supervisor, Overfield, advising him of the situation and explaining that he was proceeding to Bennett's residence. Jenkins also discussed with

Overfield the possibility of searching Bennett's residence, and Overfield agreed that a search should be conducted. Subsequently, while on route to 9 Woodrow Street, Jenkins was in fact contacted by the Rochester Police Department via the 911 Center concerning information the police had received that Bennet had a gun. In that regard, Jenkins was informed that Bennett had refused to give the police consent to search, and that the police had his residence surrounded and were requesting parole assistance. Jenkins indicated that parole already had the same information and that he was in the process of responding to 9 Woodrow Street.

After speaking with Jenkins, Cowick spoke to Fortune. Cowick informed Fortune of the information he received from Allen on the previous day and of his conversations with Jenkins. Cowick also indicated to Fortune that Bennett was in fact from Honduras. In response, Fortune directed Cowick to conduct a search of Bennett's residence at 9 Woodrow Street. Fortune did so based upon a number of factors: his knowledge of Bennett's file, including Bennett's previous absconding from supervision; the possible passport photos of Bennett that he had observed during the January 12, 2005 search of Bennett's residence; the information from Allen that Bennett may be trying to flee to Honduras and may be in possession of a handgun; and the possibility that the $7,000 seized during the January 12, 2005 search might be the proceeds of illegal activity in Ontario County. When Fortune made the decision to search, neither he nor Cowick was aware that the Rochester Police Department was involved in the matter in any way.

With respect to searches, Item 9405.04 of the New York State Division of Parole Policy and Procedures Manual ("Manual"), in relevant part, indicates the following:

**DEFINITIONS:**

*Articulable reason:* A reason based upon information which appears to be reliable and which results from: knowledge of specific facts by a parole officer, observations by said officer, communication from the releasee, or from a family member of the releasee, or from a member of the community or other informant, or from another government agency.

Note: A request to conduct a *search* by another agency shall not, by itself, constitute an *artculable reason*. In determining whether an articulable reason exists, the totality of the information received may be considered including the releasee's criminal and supervisory history.

**PROCEDURE:**

**I.**     **Searches**

   A.   Consent Searches:

      1.   Any search of a person, property or premises by a parole officer may be conducted with voluntary consent. Where possible and practical, the consent should be in writing. Consent may be withdrawn at any time prior to the conclusion of the search and, absent other authority to conduct the search, the search must be discontinued.

   D.   Searches of Premises:

      1.   Releasee: An Officer may search, or direct the search of *premises under a releasee's control* including shelters, residence programs, single room occupancies and similar dwellings, when there is an articulable reason for the search and when the search is rationally and reasonably related to the performance of the Officer's duties. Prior to conducting such a search, in the absence of *exigent circumstances* or consent, the Parole Officer must confer with a supervisor and obtain supervisory approval for such search.

After he spoke to Fortune, Cowick received another call from Jenkins. During that call, Jenkins indicated to Cowick that he had just gotten a call from the Rochester Police department, stating that there was a 911 call placed to them by an anonymous caller stating that Keith Bennett had a handgun.

Cowick arrived at 9 Woodward Street before Jenkins. Upon arriving, Cowick entered the residence. Present inside were Bennett, his roomate, Dave Madina ("Madina"), and two uniformed police officers, O'Shaugnessy and Rodriguez, who were positioned in the foyer. Cowick went into the living room area and spoke to Bennett. Cowick asked Bennett what was going on, and Bennett replied that the police had showed up saying that he had a gun in the house and that they asked him if they could search, but that he told the police that he wasn't going to let them search. However, Bennett indicated that parole could "do whatever they want." Cowick then spoke to Fortune. Cowick explained to Fortune that the RPD was there and that someone had placed a 911 call. Fortune again directed Cowick to conduct the search of the residence and to get signed consent from Bennett. When Cowick indicated that he didn't have a specific consent form, Fortune instructed him to make one up on a blank piece of paper and ask Bennett to sign.

About this time, Jenkins arrived at 9 Woodrow Street. Upon arriving, Jenkins met with Cowick on the front porch, and Cowick explained to Jenkins that he needed to get consent from Bennett to search and that it was his intent to conduct a search of 9 Woodrow Street. Jenkins and Cowick then went inside 9 Woodrow Street and spoke to Bennett. Jenkins and Cowick told Bennett that parole had information that there was a weapon in the residence, and asked if they go ahead and look around. Bennett responded "no problem," and told them to go ahead and look around. Jenkins, also had occasion to

speak O'Shaughnessy, and related to him that before he was contacted by the 911 operator, parole already had received information about the gun from an identified source, and that parole had already been intending to do a search.

After speaking to Bennett with Cowick, Jenkins went outside, onto the front porch, to call Overfield as well as Fortune to let them know what was occurring, that they had obtained an oral consent to search and that Cowick was obtaining written consent to search from Bennett. While Jenkins was on the front porch calling Overfield and Fortune, Cowick had located a blank sheet of paper and prepared a written consent to search. In the kitchen area, Cowick had Bennett read the written consent, received into evidence as Exhibit #3, and asked if he would sign it. Bennett responded, "parole can do whatever they want," and he signed the paper. During this time, O'Shaughnessy and Rodriquez were not present in the kitchen, but remained in the foyer.

Jenkins, after making the calls, went back inside 9 Woodrow Street and upon his return, Cowick showed him the written consent to search that he had obtained from Bennett. At that point, O'Shaughnessy and Rodriquez were securing Bennett and Madina. Cowick then proceeded upstairs to search Bennett's bedroom. While he did so, O'Shaughnessy and Rodriquez remained downstairs with Bennett and Madina, and Jenkins went back outside to make another phone call.

During his search of Bennett's bedroom, Cowick discovered a handgun under the mattress. Cowick then contacted Jenkins via radio and asked him to come back inside and up to the bedroom. Jenkins did so and Cowick showed him the handgun that he had discovered in Bennett's bedroom under the mattress. Cowick also informed

O'Shaughnessy and Rodriguez, who were downstairs, that he had found a gun, and he motioned to O'Shaughnessy to handcuff Bennett.

**ANALYSIS**

The defendant contends that the warrantless search of his residence at 9 Woodrow Street on January 15, 2005 was "unreasonable," and, consequently, that the handgun discovered was seized in violation of his Fourth Amendment rights. In that regard, he maintains that the government has not sustained its burden of establishing the lawfulness of the search either as a parole search or a consent search, and additionally that the search was unlawful, since the Division of Parole served as a stalking horse for the police. The Court disagrees and determines, based upon its findings of fact, that the government has established by a preponderance of evidence that the defendant validly consented to the search, that the search, in any event, was a properly conducted parole search, and that parole did not act as a stalking horse for the police.

**A.    Parole Search**

The general rule is that all warrantless searches, even when based on probable cause, are "per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One such exception would be a "parole search." While a parolee does not generally surrender his constitutional rights against unreasonable searches and seizures, his status as a parolee is nonetheless relevant in any evaluation of the reasonableness of a particular search or seizure. That is, what may be unreasonable with respect to an individual who is not on parole, may be reasonable with respect to one who is. *United States, ex rel. Santos v. New York State Board of Parole*, 441 F.2d 1216, 1218 (2d Cir.

1971). In this regard, an individual's status as a state parolee may diminish his Fourth Amendment protection from intrusion by his parole officer, since a state's operation of its parole system presents special needs, beyond normal law enforcement, that may justify departure from the normal probable cause and warrant requirements. *See Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987) (relating to probationers); *United States v. Grimes*, 225 F.3d 254, 258 (2d Cir. 2000) (applying *Griffin* to parolees). That such diminished protection may be reasonable is founded in the dual function of parole: one, to guide the parolee into constructive development and to help him achieve proper reintegration into the community; and two, to prevent parole violations for the protection of the public. *United States v. Thomas*, 729 F.2d 120, 123 (2d Cir.1984). Whether a specific parole search, undertaken without a warrant on less than probable cause, is valid depends on whether it meets the requirements of state law or regulation, and whether the state law or regulation itself complies the reasonableness mandate of the Fourth Amendment. *Griffin v. Wisconsin,* 483 U.S. at 872-73. *United States v. Grimes*, 225 F.3d at 258.

In New York, the subject of a parolee's diminished rights under the Fourth Amendment has been addressed both by case law and by regulation. In *People v. Huntley*, 43 N.Y.2d 175, 181 (1977), the New York Court of Appeals held that a parolee's constitutional right to be secure against unreasonable searches and seizures is not violated by a warrantless search by his parole officer if the latter's conduct is rationally and reasonably related to the performance of his duty as a parole officer. As to regulation, Item 9405.04 of the Manual, set forth above in the Court's findings of fact, provides a more detailed test than the one articulated in *Huntley* regarding the warrantless search of a parolee. The Manual states that a parole officer may search a parolee's residence, when

there is an articulable reason for the search and when the search is rationally and reasonably related to the performance of the officer's duties. The Manual's definition of articulable reason essentially mirrors the definition of reasonable suspicion utilized in the *Terry* stop context:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Adams v. Williams*, [407 U.S. 143 (1972)] supra, demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop. 407 U.S., at 147, 92 S.Ct., at 1923-24. Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors--quantity and quality--are considered in the "totality of the circumstances--the whole picture," *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981), that must be taken into account when evaluating whether there is reasonable suspicion.

*Alabama v. White*, 496 U.S. 325, 330 (1990). The Manual provision also requires that, in the absence of exigent circumstances or consent, the parole officer must confer with a supervisor and obtain supervisory approval for such search.

There can be no dispute that New York's operation of its parole system presents special needs which render the *Huntley* test and the Manual criteria reasonable under the Fourth Amendment. *United States v. Grimes,* 225 F. 3d at 258. Therefore, the Court turns its attention to a determination of whether the government has proven by a preponderance of evidence that the warrantless search of the defendant's residence on January 15, 2005 met the requirements of *Huntley* and/or the Manual. At the outset, the Court determines that, prior to the search of January 15, 2005, there was an articulable reason, in other

words reasonable suspicion, to believe that the defendant was in violation of his parole, based upon the totality of the circumstances. These were: the defendant's criminal record; his parole history, including his previous absconding from supervision; the possible passport photos of the defendant that were observed by Fortune during the January 12, 2005 search of the defendant's residence; the possibility that the $7,000 seized during the January 12, 2005 search might be the proceeds of illegal activity in Ontario County; and the information provided by Allen. As to Allen's information relating to the defendant's attempts to obtain a passport for flight to Honduras and his possession of a gun, which was provided to Cowick and Jenkins on January 14, 2005 and January 15, 2005, it is significant that it was not related anonymously. That is, Allen was not an anonymous caller, but an identified citizen informant. Under both New York and Second Circuit law, an identified citizen informant is presumed to be reliable. *People v. Hetrick*, 80 N.Y.2d 344 (1992); *Caldarola v. Calabrese*, 298 F.3d 156, 165 (2d Cir. 2002). Moreover, the basis of Allen's knowledge, at least as to the gun, was first hand. He saw the defendant in possession of it. Additionally, he related details which pointed to his reliability. He knew that the defendant was from Honduras and that the defendant had a roommate. Even the fact that he sounded intoxicated to Jenkins when they spoke on January 15, 2005 was consistent with his statement that he had observed the gun again when partying with the defendant the night before.

As to the purpose for the search of January 15, 2005, the Court finds by a preponderance of evidence that it was reasonably and rationally related to parole's responsibilities to guide the defendant into constructive development, by helping him to achieve proper reintegration into the community, and to prevent parole violations on his

part for the protection of the public. To put it another way, the Court finds that had parole not taken the action that it did, it would have been remiss in its duties. Finally, as to the specific manual requirement that absent consent[1] or exigent circumstances, a parole officer must confer with a supervisor and obtain supervisory approval for a warrantless search, the Court finds by a preponderance of evidence that this condition was met. As detailed in the Court's findings of fact, Cowick, prior to his search of the defendant's residence on January 15, 2005, discussed the matter with his supervisor, Fortune, at which time Fortune directed him to conduct a search.

Therefore, the Court finds by a preponderance of evidence that the warrantless parole search of January 15, 2005 comported with mandates of both *Huntley* and the Manual, and was therefore lawful.

**B.     Consent Search**

Another established exception to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). The government, of course, bears the burden of establishing by a preponderance of evidence that consent was given freely and voluntarily. *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir.1981). To be voluntary means that the consent was obtained without coercion. *Schneckloth v. Bustamonte*, 412 U.S. at 228. In that regard, voluntariness is determined based upon the totality of circumstances, with a view as to whether consent was the product of free choice rather than merely the acquiescence to authority. *Schneckloth v. Bustamonte*, 412 U.S. at 226; *United States v.*

---

[1] However, as to consent, see discussion below.

*Wilson*, 11 F.3d 346, 351 (2d Cir.1993); *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995); *United States v. $19,047.00 in U.S. Currency*, 95 F.3d 248, 252 (2d Cir. 1996). It is also well established that the concept of knowing and intelligent waiver, which is strictly applied to rights involving a fair criminal trial, does not govern in this Fourth Amendment context. *United States v. Garcia*, 56 F.3d at 422 .

Here, the defendant suggests that since the Certificate of Release to Parole Supervision, received into evidence as Exhibit #2, required him to consent to a search condition in order to obtain his release on parole, any subsequent consent to search given to a parole officer would be *per se* coercive. In support of his position, the defendant relies on *United States ex rel Coleman v. Smith*, 395 F. Supp. 1155, 1157 (W.D.N.Y. 1975). However, the Court finds the facts of that case clearly distinguishable. In *Coleman*, the district judge observed:

> The factual circumstances surrounding the signing of the consent were not developed at the suppression hearing. The only testimony was that of Michael Falk, the petitioner's parole officer. He did not witness the signing, but he stated that the petitioner had to sign in order to be released. Falk's contention is borne out by the controlling parole release regulation (9 N.Y.C.R.R. § 155.10 (1965), presently 7 N.Y.C.R.R. § 1915.5(c) (1974)), and was conceded by counsel for the respondent during oral argument in this court. **In spite of this, it is argued that the executed agreement can sustain a search occurring five months later. I disagree.**

*U.S. ex rel. Coleman v. Smith*, 395 F.Supp. at 1156 (emphasis added). The Court agrees that the search condition to which the defendant consented on August 1, 2003 cannot, standing alone establish a valid consent search on January 15, 2005. However, the fact that the defendant agreed to that condition on August 1, 2003 to obtain his release on parole, does not preclude a valid consent to search on his part on January 15, 2005. *See*

*United States v. Crawford*, 323 F.3d 700, 718 -19 (9th Cir. 2003) ("Our holding on this issue is appropriately narrow. We find that, by virtue of a signature on a compulsory parole condition, a parolee does not, in advance and in blanket fashion, consent to a general waiver of his rights under the Fourth Amendment."). To conclude otherwise would bestow on parolees greater constitutional protection than that afforded to average citizens, who based upon their voluntary consent can be subject to lawful search absent probable cause or even reasonable suspicion.

Based upon the applicable principles of law and its findings of fact, the Court determines that the government has established by a preponderance of evidence that on January 15, 2005 the defendant voluntarily consented to the search of his residence at 9 Woodrow Street. In reaching this conclusion, the Court has considered the totality of the circumstances. First, there was nothing about the defendant's physical or mental condition that precluded him from comprehending his options or from giving voluntary consent. Second, the defendant was an experienced offender with prior contact with the criminal justice system, who had previously been on parole. Third, there was no indication that the defendant was intoxicated, tired, confused, or not feeling well when Cowick and then Jenkins arrived at 9 Woodrow Street. Fourth, the defendant responded coherently to questions put to him and in fact detailed to Cowick that the police had showed up and wanted to search for a gun, but that he would not give them permission to do so. He then offered, without prompting by Cowick, that "parole could do whatever they want." Fifth, after Jenkins arrived, he and Cowick spoke to the defendant together and told him that parole had information that there was a weapon in the residence. At that time, they specifically asked the defendant if they could go ahead and look around, and the defendant responded

"no problem" and told them to go ahead and look around. Sixth, thereafter, while alone with the defendant in the kitchen, Cowick asked the defendant to read the written consent he had prepared, which was received into evidence as Exhibit #3, and asked if the defendant would sign it. The defendant responded, "parole can do whatever they want," and he signed the paper. Finally, the fact that he refused the police request to search, is a strong indication that the consent given to parole was a product of his free choice and not merely acquiescence to authority. Therefore, as indicated above, based upon all these circumstances, the Court finds that the government has established by a preponderance of evidence that the defendant's consent was not the product of any type of physical or psychological coercion, but was, rather, in all respects voluntary.

Having found that the defendant contemporaneously consented to a search of his residence, the Court now turns its attention to the significance, if any, of the search condition contained in the Certificate of Release to Parole Supervision, which the defendant signed on August 1, 2003. The New York Court of Appeals has noted that the standard authorization to search a parolee's residence included in the certificate of release "is not to be taken as an unrestricted consent to any and all searches or as a blanket waiver of all constitutional rights to be secure from unreasonable searches and seizures." *People v. Huntley*, 43 N.Y.2d. at 182. However, this does not mean that the consent given in a certificate of release is totally ineffective. In an analogous situation involving probation, the United States Supreme Court held that by agreeing in advance to a search condition, similar to the one contained in Exhibit #2, the defendant's reasonable expectation of privacy was significantly diminished, and consequently, the balance between his privacy interests and the government's interests in rehabilitation and protecting society from future

criminal violations required only reasonable suspicion to conduct a search of his residence. *United States v. Knights*, 534 U.S. 112, 113 (2001). Having found, as indicated above, that parole had "reasonable suspicion," the Court concludes that such circumstance in combination with the search condition to which the defendant consented in the Certificate of Release to Parole Supervision, which he signed, also establishes the lawfulness of the January 15, 2005 search.

**C.    Stalking Horse**

Finally, the defendant maintains that parole acted as a stalking horse for the police. The Court finds this argument to be without merit. In *United States v. Reyes*, 283 F.3d 446 (2d Cir. 2002), the Second Circuit explained:

> A probation officer acts as a stalking horse if he conducts a probation search on prior request of and in concert with law enforcement officers. However, collaboration between a probation officer and police does not in itself render a probation search unlawful. The appropriate inquiry is whether the probation officer used the probation search to help police evade the Fourth Amendment's usual warrant and probable cause requirements or whether the probation officer enlisted the police to assist his own legitimate objectives. A probation officer does not act as a stalking horse if he initiates the search in the performance of his duties as a probation officer.

*Id. at* 463. Then, in *United States v. Newton*, 369 F.3d 659, 667 (2d Cir. 2004), the Circuit observed that the

> "stalking horse" theory ... is largely foreclosed by our decision in *United States v. Reyes*, 283 F.3d at 462-65, which specifically rejected stalking horse challenges to warrantless searches by probation or parole officers accompanied by the police. Newton attempts to distinguish *Reyes* on the ground that it did not involve a full search but only a less intrusive home visit. In fact, *Reyes*'s rejection of challenges to coordinated efforts between probation/parole officers and other law enforcement officials turned not on the particular level of intrusion in that case, but on the legitimacy of the supervision objectives being pursued by the probation officers. *See id.* at 464. As *Reyes* recognized, the duties and objectives of probation/parole

officers and other law enforcement officials, although distinct, may frequently be "intertwined" and responsibly require coordinated efforts. *Id.* at 463-64. For precisely that reason, Reyes noted that "it is difficult to imagine a situation" in which a probation/parole officer who entered a residence with other law enforcement officials based on "information about a supervisee's illegal activities ... would not be pursuing legitimate supervis[ion] objectives." *Id.* at 463.

In any event, the facts of this case, like those in *Reyes* and *Newton*, do not support a stalking horse challenge. Parole was in possession of the information which led to the search prior to any communication from the Rochester Police Department. Additionally, Jenkins came to the conclusion that a search should be conducted during his discussion with Overfield while on route to 9 Woodrow Street, before he received the request for assistance from the police. Finally and most significantly, Cowick, who actually conducted the search of 9 Woodrow Street on January 15, 2005, received authorization to search from his supervisor, Fortune, at a time when neither was aware that the police were seeking assistance.

## CONCLUSION

Accordingly, the defendant's motion to suppress tangible evidence [#6] is denied in all respects.

SO ORDERED.

Dated:     Rochester, New York
           October 21, 2005        ENTER.


                                   /s/ Charles J. Siragusa
                                   CHARLES J. SIRAGUSA
                                   United States District Judge